This Opinion is a
Precedent of the TTAB

Mailed: June 3, 2020

**UNITED STATES PATENT AND TRADEMARK OFFICE**

_____

**Trademark Trial and Appeal Board**

_____

*Sock It To Me, Inc.*
*v.*
*Aiping Fan*

_____

Opposition No. 91230554

_____

Sheila Fox Morrison and Steven E. Klein of Davis Wright Tremaine LLP
    for Sock It To Me, Inc.

Tommy Songfong Wang of Wang IP Law Group P.C.
    for Aiping Fan.

_____

Before Bergsman, Kuczma, and Heasley,
    Administrative Trademark Judges.

Opinion by Heasley, Administrative Trademark Judge:

Aiping Fan ("Applicant") seeks to register SOCK IT UP (in standard characters)

on the Principal Register for "socks" in International Class 25.[1]

---

[1] Application Serial No. 86888740 was filed on January 27, 2016, based on Applicant's allegation under 15 U.S.C. § 1051(a) of first use of the mark anywhere and in commerce at least as early as January 10, 2015.

Citations to the briefs, motions and orders in this opinion are to the publicly available documents on the Board's TTABVUE docket system.

Sock It To Me, Inc. ("Opposer") opposes registration of Applicant's mark under Section 2(d) of the Trademark Act, 15 U.S.C. § 1052(d), claiming likelihood of confusion with, inter alia, its registered mark SOCK IT TO ME (in standard characters, with "SOCK" disclaimed) for "socks and stockings" in International Class 25.[2]

In its amended Notice of Opposition, Opposer added the claim that Applicant, an individual residing in China, did not own the SOCK IT UP mark when she filed her application. Instead, Opposer claims, the mark was used in the United States by another entity: JY Design and Creations, Inc. (doing business as "JY Instyle"), a California corporation. Opposer alleges that since JY Instyle used the mark in commerce, it was the owner of the mark, not Applicant. Consequently, Opposer concludes, Applicant's application to register the mark based on use in commerce under Section 1(a) of the Trademark Act, 15 U.S.C. § 1051(a), was void ab initio.[3]

Applicant's Answer denied the salient claims in the Amended Notice of Opposition, and asserted five "affirmative defenses,"[4] which were later stricken.[5]

---

[2] Registration No. 4173688, issued on the Principal Register on July 17, 2012; declarations of use and incontestability accepted and acknowledged. Opposer also based its likelihood of confusion claim under Trademark Act Section 2(d) on Registration No. 5276642, issued on August 29, 2017, for the stylized mark SOCK IT TO ME, and Registration No. 5335633, issued on November 14, 2014, for the mark SOCK IT TO ME and Design, both for "socks and stockings; underwear; intimate apparel, namely, panties, boxers, and briefs" in International Class 25. Additionally, Opposer based its likelihood of confusion claim on Application Serial No. 86753417 for the mark SOCK IT TO ME in standard characters for "tank tops; intimate apparel, namely, camisoles and bras" in International Class 25, but filed no statement of use, so the application was abandoned.

[3] Amended Notice of Opposition, 7 TTABVUE 10-12.

[4] 20 TTABVUE.

[5] Order, 24 TTABVUE.

The parties have fully briefed the opposition.

## I. Standing and Priority

Applicant concedes that Opposer "is the owner of a valid federal trademark registration for the SOCK IT TO ME standard character mark in connection with 'socks and stockings' in Class 25."[6] This registration gives Opposer standing to bring its likelihood of confusion claim. *Cunningham v. Laser Golf Corp.*, 222 F.3d 943, 55 USPQ2d 1842, 1844 (Fed. Cir. 2000). Opposer has thus met its burden of proving standing. *See Empresa Cubana Del Tabaco v. Gen. Cigar Co.*, 753 F.3d 1270, 111 USPQ2d 1058, 1061-62 (Fed. Cir. 2014); *Ritchie v. Simpson*, 170 F.3d 1092, 50 USPQ2d 1023, 1025-28 (Fed. Cir. 1999). Because Opposer relies on its pleaded registration, priority is not an issue. *King Candy Co. v. Eunice King's Kitchen, Inc.*, 496 F.2d 1400, 182 USPQ 108, 110 (CCPA 1974). And because Opposer has established its standing to assert a Section 2(d) claim, it may assert any other ground that would bar registration, including Applicant's alleged lack of ownership of the applied-for mark. *See, e.g., Corporacion Habanos SA v. Rodriguez*, 99 USPQ2d 1873, 1877 (TTAB 2011).

## II. The Record

The record includes the pleadings and, by operation of Trademark Rule 2.122(b), 37 C.F.R. § 2.122(b), the Application file. The record also includes the following evidence introduced by the parties:

---

[6] Applicant's brief, 43 TTABVUE 7.

A. Opposer

1. Testimonial declaration of Michelle Walker, Opposer's Chief Executive Officer, with exhibits;[7]

2. First notice of reliance on dictionary definitions of the words comprising "sock it to me" and "suck it up," as well as pages from Applicant's SOCK IT UP website;[8]

3. Second notice of reliance on the Trademark Electronic Search System (TESS) record for Registration No. 4581813 for the mark JYINSTYLE, articles of incorporation and statement of information for JY Designs and Creations, Inc., and Applicant's discovery responses;[9] and

4. Third notice of reliance on USPTO records showing the cancellation of third-party Registration No. 3931632, a dictionary definition of "sock it to," and pages from Applicant's SOCK IT UP website.[10]

B. Applicant

1. First notice of reliance on dictionary definitions of the words comprising "sock it to me" and "suck it up," and lyrics to "Sock It To Me" songs;[11]

2. Second notice of reliance on third party registrations for marks containing the word "sock";[12]

3. Third notice of reliance on displays of Opposer's goods and reviews of Applicant's products;[13]

4. Testimonial declaration of Applicant, Aiping Fan;[14]

---

[7] 39 TTABVUE (confidential); 40 TTABVUE (corrected versions).

[8] 27 TTABVUE.

[9] 28 TTABVUE.

[10] 36 TTABVUE.

[11] 29 TTABVUE.

[12] 30 TTABVUE.

[13] 31 TTABVUE.

[14] 32 TTABVUE.

5.   Testimonial declaration of Xochitl Avila, head of creative design of JY Designs and Creations, Inc.;[15] and

6.   Testimonial declaration of Junxia (Lucy) Yao, Chief Executive Officer of JY Designs and Creations, Inc., with exhibits.[16]

We have reviewed and considered the full record before us, and will identify relevant and probative evidence as appropriate in our discussion of the merits.

## III.   Ownership of the Applied-For Mark

We first address Opposer's claim that Applicant did not own the SOCK IT UP mark when she filed her application alleging use in commerce under Section 1(a). "Under Section 1 of the Trademark Act, only the owner of a mark is entitled to apply for registration." *In re Pharmacia Inc.*, 2 USPQ2d 1883, 1883 (TTAB 1987). A use-based application filed by a person who does not own the mark at the time of filing is void ab initio. *Lyons v. Am. Coll. of Veterinary Sports Med. & Rehab.*, 859 F.3d 1023, 123 USPQ2d 1024, 1027 (Fed. Cir. 2017); *Huang v. Tzu Wei Chen Food Co.*, 849 F.2d 1458, 7 USPQ2d 1335, 1336 (Fed. Cir. 1988) (affirming Board's holding that an application was void ab initio because the applicant was not the owner of the mark on the filing date); *Norris v. PAVE: Promoting Awareness, Victim Empowerment*, 2019 USPQ2d 370880, at *4 (TTAB 2019).

Opposer contends that Applicant did not own the SOCK IT UP mark when she filed her application: "Here, the undisputed facts uniformly demonstrate that between Applicant and [the California corporation] JY Instyle, it has always been JY Instyle that owns and controls the nature and quality of the goods and services

---

[15] 33 TTABVUE.

[16] 34 TTABVUE (confidential); 35 TTABVUE.

provided under the SOCK IT UP mark."[17] Citing Applicant's testimony and discovery

responses, Opposer states:

- "It was JY Instyle that, through its employees, conceived of and selected the SOCK IT UP mark. … When asked to identify the person most knowledgeable with regard to the selection and adoption of Applicant's mark, Applicant originally identified Xochitl Avila, JY Instyle's creative director. … Applicant subsequently attempted to amend her response to identify Ms. Yao, JY Instyle's CEO. … In neither case did Applicant identify herself, which is unsurprising given that the only evidence of Applicant's alleged involvement is Ms. Avila's testimony that Applicant 'selected' the mark 'when **the brand idea was presented to her**' by JY Instyle."[18]

- "It was JY Instyle that first affixed the SOCK IT UP mark to JY Instyle's goods and sold them in commerce."[19]

- "It was JY Instyle's stylized JY Instyle mark that appeared on packaging and promotion materials in conjunction with the SOCK IT UP mark."[20] "As shown in the details below, each of the documents Applicant identified as evidencing the first use of the SOCK IT UP mark prominently displayed the SOCK IT UP mark underneath the stylized JY Instyle mark":[21]

---

[17] Opposer's brief, 42 TTABVUE 40.

[18] Opposer's brief, 42 TTABVUE 40-41, citing Applicant's Answers to Interrogatory nos. 12 and 13, supplemental Answer to Interrogatory no. 13, Avila decl. ¶¶ 2-3. 28 TTABVUE 14, 42, 33 TTABVUE 3.

[19] Opposer's brief, 42 TTABVUE 40, citing Applicant's Answer to Interrogatory no. 12, Applicant's declaration at ¶ 8 ("With my permission, the Company first used the SOCK IT UP mark in January of 2015 to promote its Fall/Winter 2015 collection of socks on its website…."), 32 TTABVUE 3, Yao decl. ¶ 8 ("After the Company obtained the license from [Applicant] Aiping Fan, the Company first used the SOCK IT UP mark in January of 2015 to promote its Fall/Winter 2015 collection of socks on its website…."), 35 TTABVUE 3.

[20] Opposer's brief, 42 TTABVUE 40.

[21] Opposer's brief, 42 TTABVUE 26.

|  |  |  |
|---|---|---|
| Detail from document produced as "Exhibit B" (28 TTABVUE, Ex. W, at "Exhibit B") | Detail from document produced as "Exhibit J" (28 TTABVUE, Ex. W, at "Exhibit J") | Detail from document produced as "Exhibit L" (28 TTABVUE, Ex. W, at "Exhibit L") |

"The JY Instyle mark is the subject of U.S. Reg. No. 4581813 in the name of an individual, Junxia Yao."[22]

- "It was JY Instyle that paid for advertising and promotion of the socks sold under the SOCK IT UP marks."[23]

Opposer concludes, "In fact, the undisputed record discloses no evidence that Applicant played any significant role in the invention, adoption, use or promotion of the SOCK IT UP mark."[24]

In response, Applicant maintains that "while the Applicant herself did not use the mark in commerce," she granted a license for the SOCK IT UP mark to JY Instyle, a related company whose use of the mark inures to her benefit.[25] She explains that: she has been in the sock industry in the People's Republic of China for over a decade; JY Instyle is a family business owned and operated by her son and daughter-in-law,

---

[22] Opposer's brief, 42 TTABVUE 25, citing Opposer's Second notice of reliance ex. S. 28 TTABVUE 5-6. The mark in Reg. No 4581813 is JYINSTYLE in standard characters.

[23] Opposer's brief, 42 TTABVUE 40. *See* Applicant's Supplemental Answers to Interrogatory nos. 14 ("[Applicant] did not make any expenditure on advertisement and marketing. However, its licensee, JY Instyle spent $30,000.00 in 2015 and $100,000.00 in 2016 to market and advertise goods designated with SOCK IT UP.") and 24 ("In 2015, [Applicant] did not make any profit from the goods bearing the SOCK IT UP mark. However, [Applicant's] licensee, JY Instyle generated $9,922.50 in sales of goods bearing SOCK IT UP. In 2016, JY Instyle generated $151,882.16 in sales of goods bearing SOCK IT UP.") 28 TTABVUE 42-44.

[24] Opposer's brief, 42 TTABVUE 40.

[25] Applicant's brief, 43 TTABVUE 14, 21, 23.

Junxia Yao; JY Instyle's head of Creative Design, Xochitl Avila, commonly used the phrase "suck it up" while at work; when the idea of using SOCK IT UP as a brand was presented to Applicant, Applicant selected it; due to the familial relationship Applicant shares with JY Instyle, a relationship that involves daily communication between Applicant and Junxia Yao, Applicant granted JY Instyle an oral license to use the SOCK IT UP mark on socks in January 2015; that month, JY Instyle commenced use of the mark, which is often displayed prominently in conjunction with the JY Instyle mark.[26] Applicant concludes that JY Instyle's use of the SOCK IT UP mark "constitutes use of the mark attributable to the Applicant, the trademark owner."[27]

The issue, then, is whether JY Instyle is a "related company" whose use of the SOCK IT UP mark inures to the benefit of Applicant. Section 5 of the Trademark Act provides:

> Where a registered mark or a mark sought to be registered is or may be used legitimately by related companies, such use shall inure to the benefit of the registrant or applicant for registration, and such use shall not affect the validity of such mark or of its registration, provided such mark is not used in such manner as to deceive the public. If first use of a mark by a person is controlled by the registrant or applicant for registration of the mark with respect to the nature and quality of the goods or services, such first use shall inure to the benefit of the registrant or applicant, as the case may be.

15 U.S.C. § 1055.

Section 45 of the Act defines "related company" as follows:

---

[26] Applicant's brief, 43 TTABVUE 14-15, 21-23 citing Applicant's decl. ¶¶ 2-4, 6-7, 9, Avila decl. ¶¶ 2, 3, Yao decl. ¶¶ 2-6, 8, 28 TTABVUE, Ex. W, at Exhibits B, J, and L, 32 TTABVUE 3, 33 TTABVUE 3, 35 TTABVUE 3.

[27] Applicant's brief, 43 TTABVUE 23.

> The term "related company" means any person whose use of a mark is controlled by the owner of the mark with respect to the nature and quality of the goods or services on or in connection with which the mark is used.

15 U.S.C. § 1127.

"Thus, Section 5 of the Trademark Act permits an applicant or registrant to rely on use of the mark by related companies." *Noble House Home Furnishings, LLC v. Floorco Ents., LLC*, 118 USPQ2d 1413, 1421 (TTAB 2016). "The essence of related-company use is the control exercised over the nature and quality of the goods or services on or in connection with which the mark is used. When a mark is used by a related company, use of the mark inures to the benefit of the owner who controls the nature and quality of the goods or services." *Id.*

A licensee may be a related company. "It is well-settled that use of a mark by a licensee inures to the benefit of the trademark owner." *Moreno v. Pro Boxing Supplies*, 124 USPQ2d 1028, 1035 (TTAB 2017); *Pneutek, Inc. v. Scherr*, 211 USPQ 824, 833 (TTAB 1981) ("[R]ights to a mark may be acquired and maintained through the use of that mark by a controlled licensee even when the only use of the mark has been, and is being, made by the licensee."). "As a 'related company,' the licensee's use of the mark inures to the benefit of the licensor-registrant." J. THOMAS MCCARTHY, 3 MCCARTHY ON TRADEMARKS AND UNFAIR COMPETITION § 18:51 (5th ed. Nov. 2019 update) ("MCCARTHY"). *See generally* TRADEMARK MANUAL OF EXAMINING PROCEDURE (TMEP) § 1201.03(e) (Oct. 2018) ("The USPTO accepts applications by parties who claim to be owners of marks through use by controlled licensees, pursuant to a contract or agreement."). Even if there is no formal written agreement, a license can be implied. *See, e.g., Woodstock's Enters. Inc. (Cal.) v. Woodstock's Enters. Inc. (Or.)*,

43 USPQ2d 1440, 1447 (TTAB 1997) ("Both parties here agree that there is no formal, written agreement between them covering use of the WOODSTOCK'S marks. It is settled, however, that a license can be implied. … [T]he reality of the situation is akin to an informal, implied license from respondent to petitioner to use the registered mark in California."); *Univ. Book Store v. Univ. of Wis. Bd. of Regents*, 33 USPQ2d 1385, 1396 (TTAB 1994) ("the reality of the situation which existed for many years may best be characterized as that of a royalty-free, nonexclusive, implied license to use the marks").

The licensor must control the quality of goods produced under the mark by its licensee. *Visa, U.S.A., Inc. v. Birmingham Trust Nat'l Bank*, 696 F.2d 1371, 216 USPQ 649, 653 (Fed. Cir. 1982) (quality control provision in written license). But "[a] contractual provision giving the licensor the right to supervise and control the nature and quality of the licensee's goods and services is not an essential element if adequate quality control was in fact exercised." 3 MCCARTHY § 18:59. *See In re Raven Marine, Inc.*, 217 USPQ 68, 69 (TTAB 1983) ("it is also clear that controlled licensing agreements may be recognized whether oral or written in form…."); *Basic, Inc. v. Rex*, 167 USPQ 696, 697 (TTAB 1970) ("An oral license is sufficient to show a related company condition and there are elements of control between applicant and the licensee."). The issue becomes, then, whether Applicant exercised sufficient control over the quality of its licensee's socks bearing the SOCK IT UP mark for that use to inure to Applicant's benefit. *See Pneutek, Inc. v. Scherr*, 211 USPQ at 833.

Opposer points to Applicant's discovery response stating that she "does not

exercise any ownership, management, or control over JY Instyle."[28] However, "the statute merely requires that a 'related company' be controlled in respect to the nature and quality of the **goods** in connection with which the mark is used." *In re Joseph Bancroft & Sons*, 129 USPQ 329, 330-31 (TTAB 1961). It does not require control over all of the related company's affairs. 3 McCARTHY § 18:58 ("The fact that the licensor agrees not to interfere with the 'internal management of the licensee's business' does not mean that the licensor possesses an insufficient power of quality control. In the typical trademark license for use on products, the licensor does not and cannot control the whole corporate identity and governance of the licensee."). The Federal Circuit Court of Appeals has construed the statutory requirement of "control" to mean "such control as is practicable under all the circumstances of the case." *Midwest Plastic Fabricators, Inc. v. Underwriters Labs., Inc.*, 906 F.2d 1568, 15 USPQ2d 1359, 1363 (Fed. Cir. 1990). That is a question of fact. *Id.*

In this case, Applicant avers that:

> Due to the familial relationship between Junxia Yao and I, and the fact that I communicate with her on a daily basis, the terms of the license were orally communicated.

> I have provided strict guidelines to my daughter-in-law Junxia Yao regarding the use of SOCK IT UP by the Company in the United States. This includes the quality of the socks manufactured and distributed by the Company, the source of manufacturing and type of fabrics used. My daughter-in-law ensures that the nature and quality of goods associated with the SOCK IT UP mark meets our family's business standard.[29]

---

[28] Applicant's Supplemental Answer to Interrogatory no. 18, Opposer's second notice of reliance, ex. X, 28 TTABVUE 44. *See also* Applicant's decl. ¶ 4 ("While I do not exercise control over the Company's business operations in the United States, Junxia Yao and my son consult with me based on my experience in the sock industry."). 32 TTABVUE 3.

[29] Applicant's decl. ¶¶ 9-10, 32 TTABVUE 3-4.

Junxia Yao agrees:

> As [Applicant] Aiping Fan is my mother-in-law, and due to the fact that I communicate with her on a daily basis, the terms of the license were orally communicated.
>
> As part of the license, Aiping Fan has placed specific requirements on the source of manufacturing and type of fabrics used for the socks associated with the SOCK IT UP mark. I am also required to inspect the socks distributed by the Company to ensure the quality.[30]

Attached to her declaration are exhibits showing the socks JY Instyle produces and offers for sale under the SOCK IT UP mark:



Sock It Up Socks are crafted using the finest combed cotton to create iconic designs that represent every lifestyle. After a decade of worldwide experience in the sock world, We decided it was time to launch a sock line that would not only feel great but convey every individuals personality. We take pride in our brand and designs .

---

[30] Yao decl. ¶¶ 6-7, 35 TTABVUE 3.



Opposer protests that "Applicant fails to detail any method or provision for Applicant to inspect, supervise or otherwise police JY Instyle's operations to adequately guarantee that the quality of the products sold under the mark is maintained or show that Applicant has taken any steps to do so." In fact, Opposer contends, "Applicant's admission that Ms. Yao is solely responsible for the adequate supervision of the socks sold under the SOCK IT UP mark is an explicit disclaimer of Applicant's responsibility to control the activities which are directly related to the quality of the goods provided by JY Instyle."[32]

We disagree. "Sufficient control by a licensor may exist despite the absence of any formal arrangements for policing the quality of the goods sold or services rendered under the mark by its licensee(s)," *Woodstock's Enters., v. Woodstock's Enters.*, 43 USPQ2d at 1446. An informal, rather than formal, system of quality control may suffice. *Winnebago Indus., Inc. v. Oliver & Winston, Inc.*, 207 USPQ 335, 341 (TTAB 1980) *cited in Ballet Tech Found. Inc. v. Joyce Theater Found. Inc.*, 89 USPQ2d 1262,

---

[31] Yao decl. ¶ 11, ex. 2, pages from JY Instyle's Fall and Spring 2018 catalog, 35 TTABVUE 18, 27.

[32] Opposer's brief, 42 TTABVUE 41-42.

1266 (TTAB 2008), *judgment vacated pursuant to settlement,* 2013 WL 6199539 (TTAB 2013). This holds true especially where the licensor and licensee have a close working relationship, such as a familial relationship. In *Taco Cabana v. Two Pesos,* the restaurant trade dress dispute that ultimately found its way to the Supreme Court, the Fifth Circuit Court of Appeals found:

> The history of the Stehling brothers' relationship warrants this relaxation of formalities. Prior to the licensing agreement at issue, the Stehling brothers operated Taco Cabana together for approximately eight years. Taco Cabana and TaCasita do not use significantly different procedures or products, and the brothers may be expected to draw on their mutual experience to maintain the requisite quality consistency.

*Taco Cabana Int'l, Inc. v. Two Pesos, Inc.,* 932 F.2d 1113, 19 USPQ2d 1253, 1259 (5th Cir. 1991), *aff'd,* 505 U.S. 763, 23 USPQ2d 1081 (1992). *See also Paleteria La Michoacana, Inc. v. Productos Lacteos Tocumbo S.A. De C.V.,* 188 F. Supp. 3d 22, 93 (D.D.C. 2016) (Where the licensees were members of a family, the licensor "satisfied the minimum level of control necessary to avoid abandonment through naked licensing…. [T]hey regard their businesses as being part of a family tradition that stretches back generations.").

As *Taco Cabana* indicates, "The rationale behind quality control is that the public has a right to expect a consistent quality of goods or services associated with a trademark or service mark." *Woodstock's Enters. v. Woodstock's Enters.,* 43 USPQ2d at 1446. Here, Applicant has established quality control over the source of manufacturing and type of fabrics used to make socks bearing the mark, and her daughter-in-law inspects the goods to ensure that they consistently comply with these

standards. Sales have increased steadily over the years,[33] and there is no evidence of a decline in quality. *See Stockpot Inc. v. Stock Pot Rest. Inc.*, 220 USPQ 52, 60-61 (TTAB 1983) ("the gross receipts and income from the restaurant operation showed an increase and there is no evidence whatsoever to indicate that there was any decline in quality."), *aff'd*, 737 F.2d 1576, 222 USPQ 665 (Fed. Cir. 1984). These measures are, in our view, sufficient to maintain consistent control over the quality of the goods.

In sum, Applicant, as licensor, has maintained sufficient control over the nature and quality of the goods marketed by her licensee under the mark. The licensee is thus a related company within the meaning of Section 5 of the Trademark Act, and its use of the mark inures to her benefit. *See In re Diamond Walnut Growers, Inc.*, 204 USPQ 507, 509 (TTAB 1979) ("The agreement unquestionably provides control by the licensors or joint applicants over the nature and quality of the goods marketed by the licensee under the marks in question, and, as a consequence, the licensee is a related company of the joint applicants within the meaning of Section 5 of the statute and its use of the combined mark inures to the benefit of the joint applicants."). Therefore, Applicant owned the SOCK IT UP trademark when she filed her application.

IV.    Likelihood of Confusion

We base our determination of likelihood of confusion under Section 2(d) on an analysis of all of the probative facts of record. *See In re E. I. du Pont de Nemours & Co.*, 476 F.2d 1357, 177 USPQ 563, 567 (CCPA 1973) ("*DuPont*"). In making our

---

[33] Yao decl. ¶ 13, 35 TTABVUE 4.

determination, the Board has considered each *DuPont* factor for which there is evidence and argument. *In re Guild Mortg. Co.*, 912 F.3d 1376, 129 USPQ2d 1160, 1161-62 (Fed. Cir. 2019). *See Zheng Cai v. Diamond Hong, Inc.*, 901 F.3d 1367, 127 USPQ2d 1797, 1800 (Fed. Cir. 2018) (quoting *In re Mighty Leaf Tea*, 601 F.3d 1342, 94 USPQ2d 1257, 1259 (Fed. Cir. 2010) ("Not all of the *DuPont* factors are relevant to every case, and only factors of significance to the particular mark need be considered.")). Opposer bears the burden of proving its claim of likelihood of confusion by a preponderance of the evidence. *B&B Hardware, Inc. v. Hargis Indus., Inc.*, 575 U.S. 138, 113 USPQ2d 2045, 2049 (2015) ("The party opposing registration bears the burden of proof, *see* § 2.116(b), and if that burden cannot be met, the opposed mark must be registered, *see* 15 U.S.C. § 1063(b)."); *see Cunningham v. Laser Golf*, 55 USPQ2d at 1848.

Varying weights may be assigned to each *DuPont* factor depending on the evidence presented. *See Citigroup Inc. v. Capital City Bank Grp. Inc.*, 637 F.3d 1344, 98 USPQ2d 1253, 1261 (Fed. Cir. 2011); *In re Shell Oil Co.*, 992 F.2d 1204, 26 USPQ2d 1687, 1688 (Fed. Cir. 1993) ("the various evidentiary factors may play more or less weighty roles in any particular determination"). Two key considerations are the similarities between the marks and the similarities between the goods. *See In re i.am.symbolic, LLC*, 866 F.3d 1315, 123 USPQ2d 1744, 1747 (Fed. Cir. 2017) (quoting *Herbko Int'l, Inc. v. Kappa Books, Inc.*, 308 F.3d 1156, 64 USPQ2d 1375, 1380 (Fed. Cir. 2002) ("The likelihood of confusion analysis considers all *DuPont* factors for which there is record evidence but 'may focus … on dispositive factors, such as similarity of the marks and relatedness of the goods.'")); *Federated Foods, Inc. v. Fort*

*Howard Paper Co.*, 544 F.2d 1098, 192 USPQ 24, 29 (CCPA 1976) (the "fundamental inquiry mandated by § 2(d) goes to the cumulative effect of differences in the essential characteristics of the goods and differences in the marks.").

We focus on the registered mark SOCK IT TO ME (in standard characters, with "SOCK" disclaimed) for "socks and stockings"[34] because it is most similar to Applicant's mark and is registered for goods that are most similar (in fact, identical in part) to Applicant's goods. If we find confusion likely between this registered mark and Applicant's mark, we need not consider the likelihood of confusion with Opposer's other pleaded marks; and if we find no likelihood of confusion between this registered mark and Applicant's mark, we would not find a likelihood of confusion with Opposer's other pleaded marks. *See N. Face Apparel Corp. v. Sanyang Indus. Co.*, 116 USPQ2d 1217, 1225 (TTAB 2015).

### A. Relatedness of the Goods and Channels of Trade

The second *DuPont* factor concerns the "similarity or dissimilarity and nature of the goods or services as described in an application or registration…," and the third *DuPont* factor concerns the "similarity or dissimilarity of established, likely-to-continue trade channels." *DuPont*, 177 USPQ at 567.

In analyzing the second *DuPont* factor, we look to the identification of goods in the Application and pleaded Registration. *See Stone Lion Capital Partners v. Lion Capital LLP*, 746 F.3d 1317, 110 USPQ2d 1157, 1162 (Fed. Cir. 2014); *Octocom Sys., Inc. v. Houston Comput. Servs. Inc.*, 918 F.2d 937, 16 USPQ2d 1783, 1787 (Fed. Cir.

---

[34] Registration No. 4173688.

1990). Again, the Application identifies "socks" and the Registration identifies "socks and stockings." Applicant admits that the identification of goods in the Application and Opposer's Registration both include "socks."[35] Applicant states that "[i]t is not disputed that the Applicant's mark and the Opposer's mark are similar goods and operate in similar trade channels."[36]

We find, however, that the parties' identified goods are in-part identical. Because the goods are identical in-part, we must presume that their channels of trade and classes of consumers—general consumers who purchase socks—are the same. *In re Odd Sox LLC*, 2019 USPQ2d 370879, at *7 (TTAB 2019) ("the relevant consumers are those who purchase or wear socks."); *Zheng Cai v. Diamond Hong*, 127 USPQ2d at 1801; *In re Viterra Inc.*, 671 F.3d 1358, 101 USPQ2d 1905, 1908 (Fed. Cir. 2012) (identical goods are presumed to travel in same channels of trade to same class of purchasers).

The second and third *DuPont* factors thus weigh in favor of finding a likelihood of confusion.

### B. Buyers' Care and Sophistication

Under the fourth *DuPont* factor, we consider "[t]he conditions under which and buyers to whom sales are made, i.e., 'impulse' vs. careful, sophisticated purchasing." *DuPont*, 177 USPQ at 567. Opposer contends that "[s]ocks are basic articles of clothing that are purchased by ordinary purchasers comprised of the general public

---

[35] Opposer's brief, 42 TTABVUE 30 citing Applicant's response to Opposer's Request for Admission no. 14, admitting that "the recitations of goods and services in the Application and Opposer's Registration both include 'socks.'" 28 TTABVUE 63.

[36] Applicant's brief, 43 TTABVUE 20.

who possesses no specialized knowledge or expertise. … Further, because of their low cost and their availability in retail and online, socks are capable of being purchased on impulse and consumers would be expected to exercise only ordinary care in their purchasing decisions."[37] Opposer's CEO corroborates this contention, testifying that "[s]ocks are typically an inexpensive ordinary consumer item. Socks can be bought by the general public online or off the shelf via retail and mass merchandisers and department stores under conditions in which consumers will not take great care in making their purchases."[38]

Applicant admits that socks are typically inexpensive, and that typical socks are purchased by ordinary consumers exercising ordinary care.[39] Applicant maintains, however, that its socks are not typical, as they are "novelty socks."[40] "However, no evidence has been advanced to show that fashionable novelty socks, such as the Applicant's socks or the Opposer's socks are also subject to impulse purchases," Applicant states.[41]

Our decision, however, must be based on the identification of goods in the pleaded Registration and subject Application, as that determines the scope of the benefit of registration. *Stone Lion Capital v. Lion Capital*, 110 USPQ2d at 1162 (quoting *Octocom Sys., Inc. v. Houston Comput. Servs.*, 16 USPQ2d at 1787 ("The authority is

---

[37] Opposer's brief, 42 TTABVUE 31.

[38] Walker decl. ¶ 16; *see also* ¶¶ 15, 17-18, 40 TTABVUE 9.

[39] Applicant's responses to Requests for Admission nos. 18 and 20, 28 TTABVUE 64, 65.

[40] "[Applicant's] business consists of wholesale and retail of novelty socks." — "Novelty socks with iconic designs." Applicant's Answers to Interrogatory nos. 4 and 7, 28 TTABVUE 11, 12.

[41] Applicant's brief, 43 TTABVUE 21.

legion that the question of registrability of an applicant's mark must be decided on the basis of the identification of goods set forth in the application regardless of what the record may reveal as to the particular nature of an applicant's goods….")).

Applicant and Opposer identify "socks" as their respective goods of interest. This identification includes all goods of the type identified, without limitation as to their nature or price.[42] *Levi Strauss & Co. v. Abercrombie & Fitch Trading Co.*, 719 F.3d 1367, 107 USPQ2d 1167, 1173 (Fed. Cir. 2013). Thus, the goods are presumed to include socks that are relatively inexpensive. "When products are relatively low-priced and subject to impulse buying, the risk of likelihood of confusion is increased because purchasers of such products are held to a lesser standard of purchasing care." *Recot Inc. v. M.C. Becton*, 214 F.3d 1322, 54 USPQ2d 1894, 1899 (Fed. Cir. 2000), *cited in In re FabFitFun, Inc.*, 127 USPQ2d 1670, 1673 (TTAB 2018).

Because the buyers to whom sales are made are all general consumers, and the goods at issue are relatively low-priced and subject to impulse buying, we find that, the fourth *DuPont* factor weighs in favor of finding a likelihood of confusion.

C.    Strength of Opposer's Mark

"In determining strength of a mark, we consider both inherent strength, based on the nature of the mark itself, and commercial strength or recognition." *Bell's Brewery, Inc. v. Innovation Brewing*, 125 USPQ2d 1340, 1345 (TTAB 2017) (citing *Couch/Braunsdorf Affinity, Inc. v. 12 Interactive, LLC*, 110 USPQ2d 1458, 1476 (TTAB 2014)); *see also In re Chippendales USA Inc.*, 622 F.3d 1346, 96 USPQ2d 1681,

---

[42] See Opposer's reply brief, 45 TTABVUE 6-7.

1686 (Fed. Cir. 2010) ("A mark's strength is measured both by its conceptual strength (distinctiveness) and its marketplace strength (secondary meaning)."); 2 McCarthy § 11:83 ("The first enquiry is for conceptual strength and focuses on the inherent potential of the term at the time of its first use. The second evaluates the actual customer recognition value of the mark at the time registration is sought or at the time the mark is asserted in litigation to prevent another's use.").

The fifth *DuPont* factor enables Opposer to prove that its pleaded mark is entitled to an expanded scope of protection by adducing evidence of "[t]he fame of the prior mark (sales, advertising, length of use);" the sixth *DuPont* factor allows Applicant to contract that scope of protection by adducing evidence of "[t]he number and nature of similar marks in use on similar goods." *DuPont*, 177 USPQ at 567.

We first consider the SOCK IT TO ME mark's commercial strength. Under the fifth factor, likelihood of confusion fame is not "an all-or-nothing measure." *Joseph Phelps Vineyards, LLC v. Fairmont Holdings, LLC*, 857 F.3d 1323, 122 USPQ2d 1733, 1734 (Fed. Cir. 2017). It "varies along a spectrum from very strong to very weak." *Palm Bay Imps., Inc. v. Veuve Clicquot Ponsardin Maison Fondee En 1772*, 396 F.3d 1369, 73 USPQ2d 1689, 1694 (Fed. Cir. 2005) (quoting *In re Coors Brewing Co.*, 343 F.3d 1340, 68 USPQ2d 1059, 1063 (Fed. Cir. 2003)).

The record shows that Opposer has used the mark in commerce with socks and stockings since October 2004; in that time, it has experienced a significant growth in sales, and has sold more than 12 million pairs of socks in the United States; from 2007 through 2017, its gross sales in the United States, though confidential, are substantial; it advertises extensively—online, via social media, and in trade shows,

and catalogs; and its marketing expenditures in the United States, although confidential, are also substantial; it has received favorable media coverage about its humble origins and rapid expansion on well-known publications such as *Marie Claire, Elle, Seventeen, Vogue, The Wall Street Journal,* and *Forbes*.[43] Considering the entire record, we find that Opposer's sock business, originally a very small start-up, has made impressive gains in a market filled with larger competitors, and accord Opposer's mark a moderate degree of commercial strength under the fifth *DuPont* factor.

Applicant argues under the sixth *DuPont* factor that Opposer's mark "is one of many marks on similar goods that bear the name SOCK in its mark." 43 TTABVUE 19. *DuPont* factor six requires us to consider the number and nature of similar marks in use on similar goods and services. *DuPont*, 177 USPQ at 567; *Primrose Ret. Cmtys., LLC v. Edward Rose Senior Living, LLC*, 122 USPQ2d 1030, 1033 (TTAB 2016). Here, while Applicant has submitted examples of third-party registrations, it has not submitted any current market evidence demonstrating third parties *using* similar marks on similar goods and services. It is true, as Opposer observes, that the third-party registrations, with no evidence of the extent of their use in commerce, does not diminish the commercial strength of Opposer's mark. "We have frequently said that little weight is to be given such [third-party] registrations in evaluating whether there is likelihood of confusion. The existence of these registrations is not evidence of what happens in the market place or that customers are familiar with them…." *AMF*

---

[43] Walker decl. ¶¶ 4, 6-13, 40 TTABVUE 7-9, 39 TTABVUE 7-9 (confidential).

*Inc. v. Am. Leisure Prods., Inc.*, 474 F.2d 1403, 177 USPQ 268, 269 (CCPA 1973) *quoted in In re Inn at St. John's, LLC*, 126 USPQ2d 1742, 1746 (TTAB 2018), *aff'd*, 777 F. App'x 516 (Fed. Cir. 2019). "Applicant's citation of third-party registrations as evidence of market weakness is unavailing because third-party registrations standing alone, are not evidence that the registered marks are in use on a commercial scale, let alone that consumers have become so accustomed to seeing them in the marketplace that they have learned to distinguish among them by minor differences." *In re Morinaga Nyugyo Kabushiki Kaisha*, 120 USPQ2d 1738, 1745 (TTAB 2016) (also citing *AMF v. Am. Leisure Prods.*, 177 USPQ 268).

However, third-party registrations may be probative of conceptual strength or weakness as they "may be considered to demonstrate the meaning of a word which comprises the mark, or a portion thereof, to show that there is a well-known and commonly understood meaning of that word and that the mark has been chosen to convey that meaning. … The conclusion to be drawn in such a case is that there is an inherent weakness in a mark comprised in whole or in part of the word in question and that, therefore, the question of likelihood of confusion is colored by that weakness to the extent that only slight differences in the marks may be sufficient to distinguish one from the other." *In re Melville Corp.*, 18 USPQ2d 1386, 1388 (TTAB 1991) (internal citations omitted); *see also Juice Generation, Inc. v. GS Enters. LLC*, 794 F.3d 1334, 115 USPQ2d 1671, 1675 (Fed. Cir. 2015) ("Third party registrations are relevant to prove that some segment of the composite marks which both contesting parties use has a normally understood and well-recognized descriptive or suggestive meaning, leading to the conclusion that that segment is relatively weak.") (citations

omitted). As here, third-party registrations may demonstrate that one part of a mark

is merely descriptive:

> [T]hird-party registrations are relevant evidence of the inherent or conceptual strength of a mark or term because they are probative of how terms are used in connection with the goods or services identified in the registrations. 'Third party registrations show the sense in which the word is used in ordinary parlance and may show that a particular term has descriptive significance as applied to certain goods or services.' *E.g.*, *Institut National Des Appellations D'Origine v. Vintners Int'l Co.*, 958 F.2d 1574, 22 USPQ2d 1190, 1196 (Fed. Cir. 1992). *See also Juice Generation, Inc. v. GS Enters. LLC*, 794 F.3d 1334, 115 USPQ2d 1671, 1674–75 (Fed. Cir. 2015); *Jack Wolfskin Ausrustung Fur Draussen GmbH & Co. KGAA* v. *New Millennium Sports, S.L.U.*, 797 F.3d 1363, 116 USPQ2d 1129, 1136 (Fed. Cir. 2015); *In re Box Solutions Corp.*, 79 USPQ2d 1953, 1955 (TTAB 2006). Third-party registrations used in this manner are not evidence that customers are accustomed to seeing the use of other, similar, marks in the marketplace, but rather evidence that a term is suggestive or descriptive of the relevant goods or services.

*In re Morinaga*, 120 USPQ2d at 1745-46.

Based on the evidence discussed below, we find that the mark, taken as a whole,

is inherently distinctive, although its strength is somewhat limited by its first word,

SOCK, which is generic for socks. We presume the mark is inherently distinctive—at

least suggestive—because it is registered on the Principal Register. Trademark Act

Section 7(b), 15 U.S.C. § 1057(b); *In re Fiesta Palms LLC*, 85 USPQ2d 1360, 1363

(TTAB 2007) *cited in In re Fat Boys Water Sports LLC*, 118 USPQ2d 1511, 1517

(TTAB 2016). But the registration's disclaimer of "SOCK" tacitly admits that the

word is not inherently distinctive. *Alcatraz Media Inc. v. Chesapeake Marine Tours

Inc.*, 107 USPQ2d 1750, 1762 (TTAB 2013), *aff'd,* 565 F. App'x 900 (Fed. Cir. 2014).

A "sock" is "a garment that covers the foot and part of the leg usually made of cotton

or wool and worn for warmth or for protection from abrasion from a shoe or boot."[44]

And socks are clearly identified in the registration. The disclaimer prevents Opposer

from asserting exclusive rights in an unregistrable component" of an otherwise

registrable mark. 15 U.S.C. § 1056(a); *see Royal Crown Co., Inc. v. Coca-Cola Co.*, 892

F.3d 1358, 127 USPQ2d 1041, 1045 (Fed. Cir. 2018).

Even though it disclaims "SOCK," Opposer contends that its mark, viewed as a

whole, is still arbitrary (and thus inherently distinctive):

> The fact that Opposer's marks incorporates the term "sock" does not alter
> the arbitrary nature of the mark. The term "sock" is also defined as "[t]o
> hit or strike forcefully; punch" and "to deliver a blow" and has a recognized
> idiomatic meaning when included as part of the phrase "sock it to
> (someone)" that carries the meaning "[t]o deliver a forceful comment,
> reprimand, or physical blow to someone else" … or "to deliver news or
> information to someone that will have a very large impact or effect" ….
> Thus, viewed as a whole and in the context of its recognizable idiomatic
> meaning, SOCK IT TO ME is fanciful and arbitrary designation for socks.[45]

We agree that the phrase SOCK IT TO ME, taken in its entirety, does not describe

the goods. The verb "sock" means "to hit or strike forcefully; punch; to deliver a

blow."[46] The phrase "sock it to" means to "deliver a physical blow, forceful comment,

or reprimand to…."[47] The phrase "sock it to" (someone) means "To attack or compete

against someone in a very strong or forceful manner," or "to deliver news or

information to someone that will have a very large impact or effect,"[48] or "to say or do

---

[44] American Heritage Dictionary AHDictionary.com 4/29/2018, 27 TTABVUE 6.

[45] Opposer's brief, 42 TTABVUE 32.

[46] American Heritage Dictionary AHDictionary.com 4/29/2018, 27 TTABVUE 6.

[47] Dictionary.com 4/28/2018, 27 TTABVUE 26.

[48] The Free Dictionary idioms.thefreedictionary.com 4/28/2018, 36 TTABVUE 7.

something to someone in a very strong and direct way."[49] The phrase "sock it to me" is an expression popularized in the late 1960s and early 1970s by the television show *Rowan & Martin's Laugh-In*, literally meaning "give it to me," as in "a person could say 'I have an idea,' and the response would be, 'OK. Sock it to me.'"[50] So SOCK IT TO ME, taken as a whole, is not descriptive of or generic for the goods.

But "[t]he Board must determine 'how the average purchaser would encounter the mark under normal marketing of such goods and also ... what the reaction of the average purchaser would be to this display of the mark.'" *Dena Corp. v. Belvedere Int'l, Inc.*, 950 F.2d 1555, 21 USPQ2d 1047, 1052 (Fed. Cir. 1991) (quoting *In re Magic Muffler Serv.*, 184 USPQ 125, 126 (TTAB 1974)). "In some cases, in addition to the mark itself, the specific arrangement and placement of all the elements of the phrase and the manner of use and presentation on the specimen, on applicant's website, in promotional materials, and in connection with other goods or services may all demonstrate how the phrase is presented to and perceived by consumers." TMEP § 1213.05(b).

In this case, the average purchaser could encounter Opposer's mark as follows:

---

[49] Macmillan Dictionary MacmillanDictionary.com 2/4/2019, 29 TTABVUE 31.

[50] Urban Dictionary, UrbanDictionary.com 2/4/2019, 29 TTABVUE 41-45. The Urban Dictionary notes that the phrase, which has various interpretations, "generally had a[n] underlying sexual connotation. Could also mean just give me your best."



51

While some purchasers of a certain age might associate the mark as a whole with its 1960s origins, the generic meaning of "SOCK," displayed on the goods, would be lost on no one. Thus, we find that Opposer's mark, taken as a whole, is inherently distinctive, although its conceptual strength is somewhat limited by the first word of the mark, which is generic.

This finding is corroborated by Applicant's evidence of nine third-party federal registrations for marks containing the word "SOCK(S)":

| Mark; Reg. No. | Pertinent Goods |
|---|---|
| <br>Reg. no. 4561311 | Japanese style socks (tabi).<br>IC 25 |
| KEEP YOUR SOCKS ON<br>Reg. No. 2067864 | Clothing items, namely socks.<br>IC 25 |
| THINK OUTSIDE THE SOCKS<br>Reg. No. 3931632 | Wholesale distributorship and retail store services in the fields of clothing, footwear, … textile goods, … footwear accessories…. IC 35<br>[Cancelled as to clothing goods in IC 25.] |
| GOOD LUCK SOCK<br>("SOCK" disclaimed)<br>Reg. No. 4686752 | Ankle socks; Leggings; Socks; Socks and stockings.<br>IC 25 |

---

51 Walker decl. ex. A, 26 TTABVUE 8.

| NO SHOES? NO SOCKS? NO PROBLEM! Reg. no. 5217611 | … socks, stockings, …. IC 25 |
|---|---|
| LITTLE BLACK SOCK Reg. No. 5408507 | Clothing, namely, socks and hosiery. IC 25 |
| SCHOOL OF SOCK Reg. No. 5359188 | Socks; Socks and stockings; Ankle socks; Men's socks; Men's dress socks. IC 25 |
| HAPPY SOCKS ("SOCKS" disclaimed) Reg. No. 3642701 | Clothing, namely, socks. IC 25 |
| SOCKSMITH Reg. No. 5497409 | Socks, namely, ankle, crew, knee high and over the knee socks for men, women and children. IC 25 [52] |

Opposer argues that (i) "none of the third-party registrations Applicant has submitted shares more than the word SOCK with Opposer's SOCK IT TO ME mark or conveys a meaning or commercial impression remotely similar to Opposer's mark," and (ii) in any event, "the USPTO's prior allowance of other marks does not justify the registration of another purportedly similar mark if it is confusingly similar to a registered mark."[53]

In this case, the third-party registrations show that it is not uncommon for registrants to register the term "SOCK" as a play on words: "SOCKS UP!" instead of "surf's up!", "THINK OUTSIDE THE SOCKS" instead of "think outside the box", "SCHOOL OF SOCK" instead of "school of rock." The parties' respective marks follow suit: "SOCK IT TO ME" repurposed for socks, and "SOCK IT UP" instead of "suck it up." While the various phrases, taken in their entireties, are registrable, the third-party registrations corroborate what Opposer tacitly conceded via its disclaimer:

---

[52] Applicant's second notice of reliance, exs. 17-26, 30 TTABVUE 2-44.

[53] Opposer's brief, 42 TTABVUE 33-34.

customers will grasp that "SOCK(S)" refers to socks, notwithstanding any meaning as a colloquial or slang phrase. Accordingly, Opposer's mark is not entitled to such a broad scope of protection that it bars registration of every mark containing the wording "SOCK" or even "SOCK IT" for use on socks.

### D. Similarity of the Marks

Under the first *DuPont* factor, we determine the similarity or dissimilarity of the parties' marks in their entireties, taking into account their appearance, sound, connotation and commercial impression. *DuPont*, 177 USPQ at 567; *Zheng Cai v. Diamond Hong*, 127 USPQ2d at 1801; *Stone Lion Capital v. Lion Capital*, 110 USPQ2d at 1160; *Palm Bay Imps. v. Veuve Clicquot*, 73 USPQ2d at 1692. "[L]ikelihood of confusion cannot be predicated on dissection of a mark, that is, on only part of a mark. On the other hand, in articulating reasons for reaching a conclusion on the issue of confusion, there is nothing improper in stating that, for rational reasons, more or less weight has been given to a particular feature of a mark, provided the ultimate conclusion rests on consideration of the marks in their entireties. Indeed, this type of analysis appears to be unavoidable." *In re Nat'l Data Corp.*, 753 F.2d 1056, 224 USPQ 749, 751 (Fed. Cir. 1985), *quoted in TiVo Brands LLC v. Tivoli, LLC*, 129 USPQ2d 1097, 1116 (TTAB 2019). The parties compare and contrast their respective marks in part and in whole.

Opposer argues that:

> Applicant's SOCK IT UP mark and Opposer's SOCK IT TO ME mark both begin with the same two terms 'SOCK' and 'IT' presented in the same order. The only difference in the marks is that Applicant's mark ends with 'UP' while Opposer's marks end with 'TO ME'. … Applicant's use of UP in place of TO ME as the final words following SOCK IT is insufficient to

distinguish Applicant's mark from Opposer's mark, either visually, aurally or with regard to meaning.[54]

In terms of connotation and overall commercial impression, Opposer argues, "both marks are unitary phrases and, thus, have no dominant element and must be considered as a whole without dissection."[55] "Opposer's SOCK IT TO ME mark is a variant on the common idiom 'sock it to [someone]', which can mean '[t]o deliver a forceful comment, reprimand, or physical blow to someone else.'"[56] "Thus, when 'ME' is used as the object of the idiom 'sock it to [someone]' the implication is an invitation or encouragement by the speaker to a third party to deliver news or a comment that will have a forceful or significant impact on the speaker. … The invitation or encouragement signals that the speaker is prepared to accept or deal with the forceful, comment, reprimand, or physical blow."[57]

Opposer links its mark's meaning to Applicant's mark: "According to Applicant, Applicant's SOCK IT UP mark is a play on the idiom, 'suck it up', … which, as Applicant admits, can mean 'to accept or tolerate a forceful comment, reprimand or physical blow without complaining.'"[58] This refers to Applicant's response to Request for Admission no. 27:

---

[54] Opposer's brief, 42 TTABVUE 35-36.

[55] Opposer's brief, 42 TTABVUE 35.

[56] Opposer's brief, 42 TTABVUE 36, citing the American Heritage Dictionary.

[57] Opposer's brief, 42 TTABVUE 36.

[58] Opposer's brief, 42 TTABVUE 36-37.

27. Admit that the phrase "suck it up" can mean: to accept or tolerate a forceful comment, reprimand, or physical blow without complaining.

**ANSWER:**

Objection. Responding Party objects to this request to the extent that it seeks information neither relevant to the subject matter of this litigation nor reasonably calculated to lead to the discovery of admissible evidence. Responding Party responds as follows:

Admit.

[59]

Opposer concludes, "Thus, when viewed in their entireties, Opposer's SOCK IT TO ME mark and Applicant's SOCK IT UP mark convey nearly identical meanings."[60]

Applicant responds that the marks' common elements, "SOCK" and "IT," are generic, descriptive, and weak.[61] Numerous other Class 25 registered marks bear the term "SOCK" prominently, she notes.[62] And Opposer's argument that the marks' meanings are nearly identical "is a stretch as a review of the evidence shows that this conclusion is inaccurate,"[63] she contends. SOCK IT UP is a play on the term "suck it up."[64] Applicant continues:

> The term "suck it up" is an idiom that is generally defined as being "used for saying that someone has to accept a difficult or unpleasant situation even if they do not want to"; "to endure something painful, unpleasant, or otherwise dissatisfactory"; or "to endure a period of mental, physical, or emotional hardship." … In addition, the term is generally synonymous with terms, such as "be forced," "bow to fate," "cross the Rubicon," "face the music", "have no choice", "know no alternative," "leap into the breach," "pay the piper", "seize the opportunity", "stand up and take it," and "swallow the pill," "take it," "take one's medicine," and "take the rap." …
>
> The idiom "sock it to me" is an expression from the late 1960s that literally means "give it to me, and generally had a underlying sexual

---

[59] 28 TTABVUE 67.

[60] Opposer's brief, 42 TTABVUE.37.

[61] Applicant's brief, 43 TTABVUE 16-17.

[62] Applicant's brief, 43 TTABVUE 17.

[63] Applicant's brief, 43 TTABVUE 17.

[64] Applicant's brief, 43 TTABVUE 18.

connotation." … When examining the terms of the marks as a whole, the meanings they convey are not even remotely similar.[65]

We agree with Applicant that the marks, taken in their entireties, are more dissimilar than similar. Their shared word "SOCK" would be taken as a generic reference to the goods; Opposer's disclaimer of "SOCK" concedes it is not inherently source identifying. *Alcatraz Media v. Chesapeake Marine Tours,* 107 USPQ2d at 1762. The average purchaser encountering the mark under normal marketing conditions would naturally grasp its reference to the goods: socks. As noted, Opposer's mark is one of many registered marks using a play on the word "SOCK(S)." Even so, the word "SOCK" contributes to the overall commercial impression created by the marks. *In re Inn at St. John's, LLC*, 126 USPQ2d at 1748.

The shared word "IT" is a pronoun broadly "[u]sed to refer to that one previously mentioned. Used of a nonhuman entity; an animate being whose sex is unspecified, unknown, or irrelevant; a group of objects or individuals; an action; or an abstraction…."[66] In this case, neither SOCK IT TO ME nor SOCK IT UP identifies what "IT" is. "IT" might be "a forceful comment, reprimand, or physical blow" as indicated by Opposer's Request for Admission no. 27, or it might be something more general, as in "give it to me."

Even though the marks share the words "SOCK IT," their additional words—TO ME and UP— yield completely different connotations: from "give it to me" to "stand

---

[65] Applicant's brief, 43 TTABVUE 18 citing The Free Dictionary (quoting Farlex Dictionary of Idioms, 2015) TheFreeDictionary.com 2/4/2019, 29 TTABVUE 14, Urban Dictionary UrbanDictionary.com 2/4/2019, 29 TTABVUE 19, Thesaurus.com 2/4/2019, 29 TTABVUE 16.

[66] American Heritage Dictionary AHDictionary.com 4/28/2018, 27 TTABVUE 11.

up and take it." *See Lever Bros. Co. v. Barcolene Co.*, 463 F.2d 1107, 174 USPQ 392 (CCPA 1972) (ALL CLEAR! for household cleaner not similar to ALL for household cleansing products); *In re P. Ferrero & C.S.p.A.*, 479 F.2d 1395, 178 USPQ 167 (CCPA 1973) (TIC TAC and TIC TAC TOE). A multitude of differing meanings can be ascribed to the two different marks. Taken in their entireties, there is no indication that the relevant public would perceive their connotation and commercial impression as similar. Rather, the public would likely perceive them as different marks from different sources among the numerous marks using a play on "SOCK(S)" to sell socks.[67]

In sum, the dissimilarity in the marks' connotation and commercial impression outweighs their shared wording. *See Keebler Co. v. Murray Bakery Prods.*, 866 F.2d 1386, 9 USPQ2d 1736, 1739 (Fed. Cir. 1989) (agreeing with the Board that the "more important fact for resolving the issue of likelihood of confusion . . . is the dissimilarity in commercial impression between the marks").

For these reasons, the marks are more dissimilar than similar, and the first *DuPont* factor weighs against a finding a likelihood of confusion.

V.  Conclusion

We find that the dissimilarity of the parties' marks outweighs the other applicable *DuPont* factors. *See Kellogg Co. v. Pack'em Enters. Inc.*, 951 F.2d 330, 21 USPQ2d

---

[67] We give no weight to Applicant's argument that her mark often appears together with the "JY" "house mark" of its licensee, JY Instyle. Applicant's brief, 43 TTABVUE 21. That is not part of Applicant's subject application. *In re i.am.symbolic*, 123 USPQ2d at 1749 ("To the extent that Symbolic is advocating that we consider another mark … that is not part of the applied-for mark in analyzing the similarity of the marks, we decline to do so. The correct inquiry requires comparison of the applied-for mark ….").

1142, 1145 (Fed. Cir. 1991) ("We know of no reason why, in a particular case, a single *duPont* factor may not be dispositive"); *Oakville Hills Cellar, Inc. v. Georgallis Holdings, LLC*, 826 F.3d 1376, 119 USPQ2d 1286, 1290 (Fed. Cir. 2016) ("a single *DuPont* factor may be dispositive in a likelihood of confusion analysis, especially when that single factor is the dissimilarity of the marks") (quoting *Odom's Tenn. Pride Sausage, Inc. v. FF Acquisition, LLC*, 600 F.3d 1343, 93 USPQ2d 2030, 2032 (Fed. Cir. 2010) ("[E]ven if all other relevant *DuPont* factors were considered in [opposer's] favor, as the board stated, the dissimilarity of the marks was a sufficient basis to conclude that no confusion was likely.")); *Champagne Louis Roederer S.A. v. Delicato Vineyards*, 148 F.3d 1373, 47 USPQ2d 1459, 1460 (Fed. Cir. 1998) ("[O]ne *DuPont* factor may be dispositive in a likelihood of confusion analysis, especially when that single factor is the dissimilarity of the marks.").[68]

For the foregoing reasons, we find that Opposer has failed to prove its claims of non-ownership and likelihood of confusion by a preponderance of the evidence.

**Decision**: The opposition is dismissed.

---

[68] Opposer's brief argued that "the actual confusion factor is neutral." 42 TTABVUE 38. Applicant's brief did not respond to this argument, so this factor is treated as neutral.